IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Tonia Buie, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C/A No. 6:17-cv-03007-DCC |
| v. | ) | |
| | ) | |
| Charter Communications, | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW,** |
| Defendant. | ) | **AND ORDER** |
| | ) | |
| _____ | ) | |

Plaintiff Tonia Buie alleges claims of retaliation under the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA") against Defendant Charter Communications ("Charter") following her termination from its employment.

On November 2, 2020, the Court conducted a four-day bench trial. ECF Nos. 217–20. In addition to Plaintiff, the following witnesses testified at trial: Kathy Carraway, a former senior Human Resources ("HR") Director at Charter; Angela North, who worked with Plaintiff in HR; Samantha Zeigler, who worked as Inside Sales Supervisor during the relevant time period; Stacey Austin, a senior trainer with the sales and sales support training department; Melissa Lindsay-Mayers, a sales manager; Vivian Reed, a training manager; Richard Farber, the senior director of HR assigned within the customer operations business unit; Janine Hanes, an HR manager; and Kelly Evans, the operations director at Plaintiff's call center. The Court also received deposition testimony by former Charter employees Jonathan Edens and Rebecca Recker. The parties submitted a number of exhibits.

Having reviewed all evidence, the parties' arguments, and the applicable law, the Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.[1]

## I.         <u>FINDINGS OF FACT</u>

**General Background**

1.      Defendant Charter is an American corporation providing internet, television, and phone services.

2.      Plaintiff Tonia Buie is an HR professional with years of pre- and post-Charter experience in human resource management, a master's degree, and two professional HR certifications.

3.      Plaintiff first began working for Charter in 2007, in the position of HR Generalist I. Plaintiff left Charter in 2009 when she relocated for her husband's work.

4.      Plaintiff returned to Charter on May 14, 2012, as an HR Generalist II at the Hickory, North Carolina location. *See* Ptf.'s Ex. 1.[2] Later that year she received a promotion to the position of HR Director I in Greenville, South Carolina. *See* Ptf.'s Ex. 2. During this time Plaintiff worked in the field operations group and reported to Kathy Carraway.

5.      In early 2015, Plaintiff accepted a promotion to HR Director II at the call center in Simpsonville, South Carolina. *See* Ptf.'s Ex. 7. In her new role Plaintiff reported directly to Vice President Jeremy "Boomer" Stockton, with a "dotted line" to Richard

---

[1] To the extent that any findings of fact constitute conclusions of law, or vice versa, they shall be so regarded.

[2] "Ptf.'s Ex. __" and "Def.'s Ex. __" refer to the exhibits of Plaintiff and Defendant, respectively, at the bench trial.

Farber, the senior director of HR in the customer operations business unit.  The "dotted line" meant that Plaintiff also took direction and sought advice from Farber.  Stockton reported to Donna Alda, a Regional Vice President.

6.      The call center, which employed approximately 300 employees during Plaintiff's tenure, housed sales and sales support.  Plaintiff testified that her role at the call center was significantly different from her role in field operations, particularly in terms of the amount of day-to-day travel involved.

7.      Plaintiff's responsibilities as HR Director II included: "[e]nsur[ing] legal compliance with all applicable local state and federal employment laws, including but not limited to FLSA, FMLA and ADA[] to minimize risk/exposure to the company"; "the development of employees"; and "[c]onduct[ing] employee investigation and oversee[ing] all escalated employee issues, including ethics point reports."  Ptf.'s Ex. 15.  Plaintiff supervised a staff of one manager, a coordinator, and a generalist.

**Changes in Leadership**

8.      In November 2015, Charter terminated Stockton.  Both directors, Plaintiff and Kelly Evans, began to report directly to Alda.  Evans took on Stockton's sales role on a temporary basis, pending the hiring of Stockton's replacement.

9.      Tensions between Plaintiff and Evans regarding their respective management roles soon escalated.  On November 18, 2015, Evans emailed Alda about an interaction earlier that day between Plaintiff and training manager Vivian Reed in which Plaintiff notified Reed that one of her trainers had applied for seven different job postings. Def.'s Ex. 3.  Reed advised Plaintiff to "let it roll" and stated she would not "stand in the way of [the trainer] considering other options."  *Id*.  Plaintiff responded that she would not

"let it roll" and that the trainer needed guidance because her applications appeared random.  *Id*.  Evans represented to Alda, based on Reed's report, that Plaintiff was "not in favor of 'serial posting' and felt [Reed] should stop [the trainer]."  *Id*.  In this and subsequent emails to Alda, Evans complained that Plaintiff was not following her guidance on the issue and was not staying in her own "swim lane."  *Id*.

10.     In a follow-up email to Alda on November 19, 2015, Evans outlined seven bullet point "suggestions" for dealing with Plaintiff.  Def.'s Ex. 3.  Evans referenced Plaintiff's "constant digging" in her investigations as causing anxiety on the floor and suggested reviewing the questions asked in Plaintiff's investigations, having someone else present in the room during the investigations, and imposing a time limit on the investigations because they were "dragg[ing] out way too long."  *Id*.  However, Evans denied in her testimony that she had any desire to know of or control the contents of the investigations.

11.     In the same email to Alda, Evans emphasized that she was "able, capable and skilled at running large call centers" and that she could "make great things happen if you let me."  *Id*.  Her seventh bullet-point suggestion was: "Allow me and support me running the site."  *Id*.

12.     Evans again emailed Alda on December 31, 2015, about an incident in which an employee named Johnese Harris was sent home for a dress code violation but remained in the building in HR.  Def.'s Ex. 8.  Plaintiff testified that Harris came to her office in tears and fell on the floor.  When Evans emailed Plaintiff asking for an update, Plaintiff responded, "She is gone home."  *Id*.  Although Evans stated in her email to Alda

that Plaintiff was "upset" and felt that Evans "should not be questioning when someone is in HR," *id.*, Plaintiff, at trial, denied making any such representation.

13.      On January 8, 2016, Alda indicated in an email to Plaintiff and Evans that Plaintiff would be reassigned to report under Evans until Stockton's vacant position was filled. Ptf.'s Ex. 8. This reporting change was effective January 25, 2016.

**Employee Medical Records**

14.      At some point after Alda's email directing Plaintiff to report to Evans, but no later than January 18, 2016, Evans asked Plaintiff to see employee medical records.

15.      Plaintiff had a particular concern about Evans seeing personal medical information because of disparaging comments Evans had made about people who took FMLA leave and requested accommodations, particularly those with mental disabilities.

16.      Both Plaintiff and her replacement, Rebecca Recker, described Evans as complaining about people who tried to get out of work by requesting leave and accommodations. *See*, *e.g.*, Recker Deposition at 53:18–24. However, Recker took two periods of FMLA leave during her employment without any apparent retaliation.

17.      Jonathan Edens, who worked under Evans as a supervisor, expressed his concern about being asked by Evans to ensure those who took FMLA did not exceed the parameters of their leave. Edens Deposition at 54–57.

**Accommodations Meeting on January 18, 2016**

18.      Various employees at Charter were provided bathroom breaks as accommodations for various disabilities, such as pregnancy, kidney disease, or side effects of medication. Charter determined the need for the accommodations in advance with the HR department. Whether breaks were approved, and for how long, would be

decided on a case-by-case basis dependent on such variables as the employee's individual condition and needs.

19.     This approval process was dictated by Charter's policies and called for supervisors to be involved in the assessment of whether an employee could perform the essential functions of the job with the accommodation under consideration. Ptf.'s Ex. 10 at 00900-01. The policies did not provide for disclosure of medical information to supervisors.

20.     Plaintiff and Farber both testified that Charter's policies were drafted to comply with and mirror the ADA and the FMLA, as stated in the policies themselves. *See* Ptf.'s Ex. 13 at 000930, 000934.

21.     On January 18, 2016, Evans and Plaintiff had a meeting which resulted in the cancellation of all bathroom break accommodations for employees in Evans' group. No other person was present during their discussion.

22.     Plaintiff's and Evans' accounts of the meeting differ substantially. According to Plaintiff, Evans directed Plaintiff to send an email immediately cancelling all accommodations for bathroom breaks. Plaintiff disagreed with Evans' directive and told her that Charter could not cancel everybody's bathroom break accommodations in "one fell swoop."

23.     Plaintiff testified that the meeting was very contentious and that she was very concerned about Evans' directive.

24.     Evans, conversely, testified that cancellation of the bathroom break accommodations was Plaintiff's idea after she learned about "schedule adherence," which led her to determine that additional bathroom break accommodations were unnecessary.

25.     Evans testified that the meeting went very smoothly and that Plaintiff expressed no concern about canceling the accommodations.

26.     Charter's policy of "schedule adherence" meant that in addition to one lunch break and two 15-minute breaks, employees could miss 4% of the remaining workday without consequence.  In other words, an employee could observe "schedule adherence" by working 96% of the time apart from his or her lunch break and two 15-minute breaks.

27.     Angela North, who worked in HR and had a discussion with Plaintiff after the meeting, recalled that Plaintiff was very upset.

28.     Plaintiff was concerned about the prospect of litigation, and Charter policies required its managers to escalate concerns in such situations.

29.     Plaintiff testified that she called Farber on the day of the meeting to express her concern about expiring the bathroom break accommodations.  She also expressed her concern about Evans' request to see employee medical files in order to make decisions about ADA accommodations.

30.     Farber testified that he recalled speaking with Plaintiff about Evans' request to see medical records but not about her directive to expire the bathroom break accommodations.  He recalled Plaintiff's voicing a concern that the medical records request was a violation of the law.  Farber was not concerned about the medical records

because he understood, after speaking with Evans, that Evans did not request to see specific files or ask questions about the employees' medical conditions.

31.     On January 18, 2016, the day of the meeting, Plaintiff sent out an email stating that all accommodations for extra breaks would expire at the end of the day. Ptf.'s Ex. 16. The email advised affected employees that their extra break accommodations would need to be recertified.

32.     Three days later, on Thursday, January 21, 2016, Evans sent Plaintiff two consecutive emails stating that several agents had not been notified of the change and asking for an update when notifications were 100% complete. Ptf.'s Ex. 16.

**Plaintiff's FMLA Leave**

33.     Plaintiff went on leave from January 20, 2016, through January 29, 2016, and returned on February 1, 2016. Plaintiff testified that this leave was necessary because the contentious meeting with Evans had exacerbated her existing depression.

34.     Plaintiff testified that she went to see her doctor on January 19, 2016, and that her doctor "took [her] out of work."

35.     Plaintiff specifically asked her physician not to document her mental illness on the FMLA certification because Plaintiff was nervous about her return to work, particularly in light of Evans' comments about employees with mental illness.

36.     Farber personally handled Plaintiff's FMLA request, and Plaintiff told Farber that she did not want Evans seeing her medical information. Farber approved Plaintiff's leave. Ptf.'s Ex. 18.

37.     Plaintiff testified that Evans treated her in a hostile manner after her return from leave and requested to see her medical certification three times.

**Plaintiff's 2015 Performance Review**

38.     Evans completed Plaintiff's 2015 performance review on February 19, 2016.  Def.'s Ex. 37 at 028231.  Evans rated Plaintiff as having achieved expectations overall.  Def.'s Ex. 1 at 000079.  However, Plaintiff received the lowest possible numerical rating (2.8) compatible with a rating of "Achieved Expected Performance."  *Id*.  Plaintiff qualified for and received her bonus for meeting her individual goals.

39.     Plaintiff's 2015 performance review documented numerous performance issues, including: struggling to adapt to the call center environment, an aggressive and condescending communication style, occasional perceived lack of availability, sometimes failing to reach out to her STL peer for support, feedback from Plaintiff's client group that she needed to provide better support, investigations that lacked immediate resolution and lasted longer than expected, and slow turnaround on pending corrective actions.  Def.'s Ex. 1.

40.     Charter's established timeline for performance reviews required Evans to complete her draft of Plaintiff's review in mid- to late December 2015, so that it could be reviewed by Alda and Farber in January 2016 and delivered to Plaintiff in February 2016. Evans testified that this timeline was followed in Plaintiff's case.

41.     Evans never supervised Plaintiff in 2015, nor had she been involved in the discussions about Plaintiff's 2015 goals and objectives upon which the review was based. Although Stockton, who had been Plaintiff's supervisor for the majority of the review

period, was no longer present to give his feedback, Evans testified that she solicited feedback from other call center managers in drafting the review.

42.     After receiving her 2015 performance review, Plaintiff called Farber about her lower-than-expected ratings.   Farber testified that she was upset but seemed determined to improve.

**Draft Corrective Action**

43.     In late February 2016, Evans circulated a draft corrective action report and investigative report documents (collectively, "draft CAR") with Farber and Alda.  Def.'s Ex. 37.  A corrective action report is a type of formalized corrective action at Charter.

44.     The draft CAR stated: "Over the course of 2 months, there have been several incidences of inaccurate or incomplete business processes that occurred in the HR department.   These incidences were communicated and brough [sic] to Toni's attention as they occurred."   Def.'s Ex. 37 at 028233.   Eleven instances of "previous corrective action" were listed.   Some of these instances noted discussions of general issues, e.g., a follow-up discussion of Plaintiff's annual review and her overall communication style.   Others described specific incidents such as payroll errors.

45.     Next to each instance of "previous corrective action," the draft CAR documented that Plaintiff had been "coached."   At trial, Plaintiff denied any coaching sessions by Evans during the relevant time period except for the February 19, 2016, delivery of her 2015 performance review, to the extent that could be considered a coaching.  No documentation establishes whether the coaching sessions occurred.

46.     The draft CAR was not immediately approved for delivery.  Instead, Farber recommended that the same message be delivered in a strong coaching session, followed by a less formal document than a corrective action.

47.     In an email to Alda dated March 17, 2016, Farber expressed concern about giving Plaintiff "a written warning (with no apparent very recent 'trigger')."  Ptf.'s Ex. 46. In a follow-up email on the same day, Farber reiterated his concern, stating: "Since the deliverance of the review, to my knowledge there have been no additional major 'errors' or any other hair on fire scenarios involving Tonia; thus my 'timing' concern . . . why now?" *Id*.  He suggested waiting until Stockton's replacement started in a couple of weeks and letting her decide what steps to take with Plaintiff.

48.     Plaintiff was unaware, during this time, that corrective action was being discussed.

**Edens Interview**

49.     On Monday, March 14, 2016, Plaintiff met with employee Jonathan Edens, a supervisor, following his notice of resignation.  Edens understood the meeting to be an exit interview.  However, he was surprised to be asked about an earlier incident in which information was leaked that he was on a performance improvement plan ("PIP").

50.     Lindsay-Mayers, who worked as a sales manager under Evans, reported to Evans that the Edens interview had been conducted in an unprofessional manner and that Plaintiff was spreading lies about Lindsay-Mayers.  Although Lindsay-Mayers was not present during the interview, she testified that her concerns were based on what Edens had told her.  Lindsay-Mayers reported to Evans that Plaintiff thought she, Lindsay-

Mayers, was the "leak" in the department who had improperly disclosed to another employee, Kayla Lake, that Edens had been put on a PIP.

51.     In his signed Declaration of October 28, 2016, and his deposition testimony given November 29, 2018, Edens did not recall complaining to anyone that he felt uncomfortable during the interview.  *See generally* Edens Deposition; ECF No. 85-8.

52.     Evans contacted Alda and Farber and told them about Lindsay-Mayers' report and her discussion with Edens.  Evans requested permission to terminate Plaintiff's employment immediately based on this incident and the associated complaint.

53.     Farber determined there should first be an investigation of the Edens incident.

54.     Evans suspended Plaintiff on March 18, 2016.

**HR Investigation**

55.     On March 21, 2016, Farber directed Janine Hanes, an HR manager in St. Louis, to investigate the Edens interview.  Farber suggested that Hanes speak initially with Evans, Lindsay-Mayers, and Edens.

56.     Hanes spoke with Evans, Lindsay-Mayers, Edens, Morrone, Reed, and Plaintiff in the course of her investigation.

57.     Hanes took handwritten investigation notes which she later shredded. However, she recorded the substance of these handwritten notes as typed documents. Def.'s Ex. 9.  She recorded various complaints by her interviewees about Plaintiff and HR, some related to the Edens interview and some unrelated.

58.     Hanes' notes of her interview with Edens include no mention that he felt "uncomfortable" during the exit interview.

59.     Hanes summarized seven "Common Themes" in her notes: that HR was not visible; that there was a lack of trust and confidence in HR; that HR did not "know the business"; that supervisors were being undermined; that Plaintiff was too close to representatives; that HR was inconsistent, slow, and error-prone; and that Plaintiff blamed management for everything.  Def.'s Ex. 9.

60.     Hanes testified that she reached no conclusions about the Edens interview, as the purpose of her investigation was simply to obtain information.

**Plaintiff's Termination**

61.     Farber testified that he supported termination based on the Hanes investigation because "I believed that there was enough corroboration that, again, there was unprofessional conduct that took place by Ms. Buie that made Mr. Edens feel uncomfortable."

62.     Farber testified that it was the cumulative effect of so many complaints about Plaintiff that led to his decision to support termination, with Evans' call about the Edens matter being the "last straw."

63.     On March 25, 2016, Alda fired Plaintiff over the phone, while Hanes was on the line.  *See* Def.'s Ex. 9 at 065851–52 (Hanes' notes of the termination call).  Alda never informed Plaintiff that she was being terminated for anything having to do with Edens.

**Damages and Post-Termination Employment**

64.     Plaintiff's annual salary with Charter at the time of termination was $99,999.  Ptf.'s Ex. 29.  In addition to her base salary, Plaintiff received bonuses based on individual and company performance.   Plaintiff received her 20% bonus for each full year of

employment, including 2015, as well as her long-term incentive plan stock options ("LTIP").

65.     Charter paid Plaintiff through the end of March 2016.

66.     The parties have stipulated that if Plaintiff met performance expectations in each applicable year, Plaintiff would have received a 3% increase to her base salary for each year since her termination.  Ptf.'s Ex. 37.

67.     The parties have stipulated that, if Plaintiff met performance expectations in the years since her termination, she would have received bonuses of $25,487.98 in 2016; $20,328.86 in 2017; $20,278.35 in 2018, and $22,138.74 in 2019.  *Id.*

68.     The parties have stipulated that Plaintiff would have received LTIP awards as follows:

(a)     2014 LTIP Award: $30,765.00, to be paid on or around mid-January 2017.

(b)     2015 LTIP Award: $30,000, to be paid on or around mid-January 2018.

(c)     2016 LTIP Award: $30,000, to be paid on or around mid-January 2019.

(d)     2017 LTIP Award: $30,000, to be paid on or around mid-January 2020.

(e)     2018 LTIP Award: 85 Restricted Stock Units, valued at $30,000 as of the grant date, with a vesting date on or around mid-January 2021.

(f)     2019 LTIP Award: 120 Restricted Stock Units, valued at $35,000 as of the grant date, with a vesting date on or around mid-January 2022.

(g)     2020 LTIP Award: 68 Restricted Stock Units, valued at $35,000 as of the grant date, with a vesting date on or around mid-January 2023.

*Id.*

69.     After Charter terminated Plaintiff, she applied for over 100 jobs in various states.

70.     Plaintiff was hired as an HR professional by Benore Logistics ("Benore") and began work on May 23, 2016, less than two months after her termination.  Benore provided a base salary of $90,000.  Plaintiff received no bonuses and she learned that Benore did not have a bonus.  Benore had no benefits such as the LTIP.

71.     Plaintiff left Benore voluntarily in August 2016 because she assumed that she would be terminated after missing four days of work.  She testified at trial that she struggled in the job due to her depression, which was worsened by having Evans as her manager.  However, in her Benore exit interview on August 24, 2016, Plaintiff made no mention of her depression.  She cited "the physical rigors of the position" (such as walking long distances), the uniform requirement, the "inefficient" work processes, the "unstructured environment," and the fact that her position had "very little influence" as the reasons for her resignation.  Def.'s Ex. 65.

72.     Plaintiff testified that her struggle with depression pre-dated her employment with Charter and had caused her to miss work intermittently since 1994.

73.     After her resignation from Benore, Plaintiff obtained employment at Advanced Ceramics beginning on May 1, 2017,[3] as an HR generalist or manager.  Def.'s Ex. 59.  She was terminated on September 20, 2017.  Def.'s Ex. 60.

---

[3] Although it appears, based on Advanced Ceramics' records, that Plaintiff's first actual day of work was May 1, 2017, her first full pay period began on April 30, 2017. Def.'s Ex. 59.

74.     Plaintiff was hired in December 2017 at Windstream Communications in HR.  She was informed that she would be laid off in March 2019.  After Windstream extended her layoff date, she found other employment before being laid off.

75.     Plaintiff was hired by Southern Management on April 25, 2019, to work in HR.  She was laid off in November 2019.

76.     To supplement her earnings, Plaintiff also worked a number of part-time jobs, including teaching at Virginia College and Webster University, and working through MarketPlace Staffing and at Hobby Lobby.

77.     Plaintiff is currently employed at ChartSpan, where she makes a yearly salary of $82,500.  There are no stock options.

## II.     **CONCLUSIONS OF LAW**

**Count I: Americans with Disabilities Act**

The ADA prohibits retaliation by a covered employer against any individual for opposing activity made unlawful by the Act, or for participating in an investigation or other proceedings under the Act.  42 U.S.C. § 12203(a); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015).  To prevail on a claim of retaliation under the ADA, the plaintiff must establish by a preponderance of the evidence "(i) that [she] engaged in protected activity, (ii) that [her employer] took adverse action against [her], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity."[4]  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016)

---

[4] At this procedural posture, Defendant has met its burden of production by "offering admissible evidence sufficient for the trier of fact to conclude" that Plaintiff was fired because of her work performance.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).  Accordingly, there is no further need to apply the *McDonnell Douglas* burden-shifting framework.  *Id*. (citations omitted).  Evidence of Defendant's proffered

(alterations in original) (quoting *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015)).

There is no dispute that Defendant took adverse employment action against Plaintiff by suspending and then terminating her employment. Therefore, the remaining issues for the trier of fact are (i) whether Plaintiff engaged in protected activity and (ii) whether that protected activity was a but-for cause of Plaintiff's suspension and termination.

A. <u>Protected Activity</u>

Plaintiff alleges that she engaged in protected activity when she opposed Evans' directive to expire all existing bathroom break accommodations. The ADA protects opposition by an employee of activity prohibited by the statute. 42 U.S.C. § 12203(a). However, "[a] plaintiff need not establish that the conduct she opposed actually constituted an ADA violation." *Freilich v. Upper Chesapeake Health*, 313 F.3d 205, 216 (4th Cir. 2002) (citing *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 357 n.1 (4th Cir. 1985)).[5] Rather, the plaintiff need only establish a "reasonable, good faith belief" that the opposed activity violated the ADA. *Id.* (citing *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000)).

---

legitimate reasons for Plaintiff's suspension and termination will, of course, be relevant to determine whether Plaintiff has established a causal relationship between those adverse employment actions and her protected oppositional activity.

[5] *Ross* involved a discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), rather than the ADA. 759 F.3d at 356. However, the *Freilich* court made no distinction between Title VII and the ADA for purposes of determining what constitutes protected activity.

Defendant first makes the purely factual argument that Plaintiff did not oppose expiring the bathroom break accommodations, citing Evans' testimony that expiration of the accommodations was Plaintiff's own idea. However, the Court does not find Evans' account of the January 18 meeting sufficiently credible to reach any such conclusion. While Evans testified that the meeting was a "light" conversation and went smoothly, Plaintiff's version of events—that it was contentious and very upsetting—is corroborated by the testimony of Angela North, who recalled Plaintiff's mental state after the meeting as being very upset. Indeed, given the apparently ongoing disagreement between Evans and Plaintiff and the recurring accusation that Plaintiff was overly aggressive in her communication style, it would have been more surprising if the January 18 meeting had proceeded smoothly. Evans' specific testimony that the idea of expiring accommodations originated with Plaintiff is also undercut by her repeated insistence that Plaintiff finish expiring all bathroom break accommodations. *See* Ptf.'s Ex. 16. Evans' contemporaneous emails appear contrary to her assertions that she "didn't think much about" the bathroom breaks "because [Plaintiff] said she was going to handle it," that "I just let her handle it from there," and that "I didn't think twice about it."

Having reviewed the evidence and heard the conflicting testimony regarding the January 18 meeting, the Court credits Plaintiff's account and finds that Evans, not Plaintiff, proposed expiring the bathroom break accommodations. *See*, *e.g.*, *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001) (where two employees testified to very different accounts of a meeting, the trier of fact was entitled to credit one testimony over

the other).  The Court further finds that Plaintiff opposed Evans' directive, both by voicing her opposition to Evans during the meeting and later by notifying Farber.[6]

Second, Defendant contends that it was not objectively reasonable for Plaintiff to believe that expiring the bathroom break accommodations in "one fell swoop" violated the ADA, because employees were always allowed to take bathroom breaks regardless of their accommodations.[7]  The Court disagrees because sufficient legal authority exists to render Plaintiff's belief objectively reasonable.  "The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation.'"  *Jacobs*, 780 F.3d at 581 (alteration in original) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013)).  "The determination of '[w]hether a particular form of assistance would be required as a reasonable accommodation must be determined on an individualized, case by case basis[.]'"  *Hendrix v. AT&T*, C/A No. 3:09-cv-2174-CMC-PJG, 2011 WL 2193201, at *4 (D.S.C. Apr. 20, 2011) (quoting 29 C.F.R. pt. 1630, app. § 1630.9), *report adopted*, 2011 WL 2192833 (D.S.C. June 6, 2011).  As both Plaintiff and Farber testified, a case-by-case determination of employee accommodations was also the general policy at Charter.

This Court need not, and does not here, determine whether Charter's wholesale expiration of bathroom break accommodations under Evans' direction was in fact

---

[6] Although Farber did not recall discussing the bathroom break accommodations with Plaintiff, he did recall Plaintiff's complaints about Evans' desire to view employee medical records.  Given Farber's testimony that Plaintiff freely voiced her concerns about Evans to him, and Plaintiff's unequivocal testimony that she called him about the bathroom break accommodations on the day of the meeting, the Court finds no reason to doubt that the conversation occurred.

[7] It was also proposed during trial that Evans' directive was permissible because of Charter's policy of "schedule adherence," as described above in the Findings of Fact.

unlawful.  *See Freilich*, 313 F.3d at 216.  It is sufficient to find that Plaintiff was reasonable in her belief that the sudden, wholesale expiration of all employees' bathroom break accommodations violated the ADA by subverting the individualized process described in the cases above.  Therefore, the Court finds that Plaintiff engaged in protected oppositional activity with respect to the expiration of bathroom break accommodations.

B. Causation

On a claim of retaliation, the plaintiff satisfies the causation element only by demonstrating that the retaliation was a "but-for cause" of the adverse employment action.[8]  *Guessous*, 828 F.3d at 217 (quoting *Foster*, 787 F.3d at 252).  However, "a cause need not work in isolation to be a *but-for* cause."  *Id*. (citing *Burrage v. United States*, 134 S. Ct. 881, 888 (2014)) (emphasis in original).

In support of its argument that Plaintiff's oppositional activity did not cause her suspension or termination, Defendant adduces significant evidence of complaints and other performance-related problems, all of which arose quite suddenly upon Stockton's departure in November of 2015.[9]  Although the bulk of the complaints originated with Evans, who compiled Plaintiff's 2015 performance review and was in frequent contact with Alda and Farber, Reed and Austin also documented complaints about Plaintiff at

---

[8] This is in contrast to status-based discrimination claims, where the employee need only show that the discriminatory motive was "one of the employer's motives."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2523 (2013).

[9] The Court notes, for the sake of completeness, that some friction appears to have existed between Plaintiff and sales support director Joe Morrone prior to November 2015.  *See* Def.'s Ex. 12.  However, there is no indication that any of Plaintiff's superiors considered this friction to be a disciplinary or performance issue prior to Stockton's termination.

Evans' suggestion in January 2016. *See* Def.'s Exs. 10, 11. Lindsay-Mayers also testified to concerns regarding the Edens interview and the Harris dress code incident.

However, the fact that Plaintiff's alleged performance problems began suddenly, following a substantial period without any documented issues, casts doubt on Defendant's proffered reason for her termination. *See*, *e.g.*, *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 408 (4th Cir. 2005) ("The record reveals that, just after Santos expressed opposition to Navy Federal's scheme to retaliate against Simms, Santos was given a 'special review,' which was significantly harsher than her previous evaluation[.]"); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 544 (4th Cir. 2003) (jury could have concluded that retaliation occurred where the plaintiff "went from being recognized as a superior employee to being faced with constant 'nitpicky' criticisms and the repeated charge that 'your job is not up to par'"). The record reveals no disciplinary action prior to Stockton's departure in November of 2015, nor is there any evidence that Stockton was dissatisfied with Plaintiff's work. Defendant suggests that Plaintiff's pre-2015 work history with Charter, which included a bonus each year and several promotions, is irrelevant because she served in a different role. Although Plaintiff acknowledged significant differences between her positions in field operations and at the call center, it is clear that her previous experience as an HR Director I was not wholly unrelated to her work as an HR Director II. The Court therefore takes note of the fact that her previous record at Charter, particularly in a Director role beginning in 2012, was unblemished. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 728 (4th Cir. 2019) (noting the defendant's witnesses "uniformly conceded that Westmoreland had served the company

and its predecessors ably for more than three decades, during which time her supervisors never discerned any issues regarding her integrity").

Moreover, it appears to the Court that the documented issues were, by and large, relatively minor and amounted to "nitpicky criticisms" rather than performance problems of any substance. *See Bryant*, 333 F.3d at 544. For instance, the sum total of the Harris incident was that Harris was sent home for a dress code violation, visited Plaintiff's office in tears, and then left the building. When Evans sent an email at 3:33 p.m. that same day asking Plaintiff to "give me an update," noting, "I am hearing that she is still in the office (in HR) although she was asked to go home to change due to a dress violation around 2:00pm," Plaintiff responded two minutes later with: "She is gone home." Def.'s Ex. 8. Evans' subsequent assertion to Alda that Plaintiff was "upset" at being asked for an update is unsupported and appears contrary to the record evidence. Another "incident" involved Plaintiff's showing up 30 minutes late to assist with an employee's suspension because her husband was at the emergency room. Yet another "incident" involved a message from Plaintiff to Reed, notifying Reed that an employee had applied for seven different job postings and advising that the employee needed guidance. Def.'s Ex. 3. Reed reported the conversation to Evans, who repeated it to Alda and complained about Plaintiff's failure to stay in her own "swim lane." In fact, prior to the Edens interview, Farber sent emails to Alda on March 17, 2016, expressing his concern about giving Plaintiff "a written warning (with no apparent very recent 'trigger')" and asking "why now?" with respect to her suggested termination. Ptf.'s Ex. 46.

Even the Edens interview, the purported catalyst for Plaintiff's suspension and termination, presents no clear evidence of serious wrongdoing. *See Westmoreland*, 924

F.3d at 728 (quoting *Kempcke v. Monsanto Co.*, 132 F.3d 442, 447 (8th Cir. 1998)) ("the jury could reasonably have questioned whether firing Westmoreland for one infraction that did not require termination 'was such an extreme overreaction as to be pretextual'"). The investigation by Hanes appears to have been a targeted and purposeful effort to justify termination rather than a good faith fact-finding endeavor. Hanes' notes include diffuse complaints about Plaintiff by witnesses—Reed, Lindsay-Mayers, and Morrone—who were obviously hostile to Plaintiff and friendly with Evans. Notably, at no point did Edens himself make a formal complaint against Plaintiff. Nor did he at any point confirm Lindsay-Mayers' and Evans' assertions that he felt "uncomfortable" during the interview. This is particularly noteworthy since Farber testified that Hanes' investigation revealed "enough corroboration that, again, there was unprofessional conduct that took place by Ms. Buie that made Mr. Edens feel uncomfortable." In fact, there is no credible evidence that Edens felt uncomfortable.

In light of all the available evidence, the Court finds that Defendant's proffered reason for taking disciplinary action against Plaintiff (performance issues in her work) was pretextual. "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). However, such a conclusion is not inevitable. "If the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent." *Id.* at 148 (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1338 (2d Cir. 1997)).

As an alternative theory, Defendant argues that even if Plaintiff was not fired for legitimate performance issues, she was fired because of Evans' animosity which predated her protected oppositional activity. Because, undoubtedly, such animosity did exist prior to January of 2016, Defendant's contention merits careful consideration. Upon review of all the evidence, however, the Court finds that Plaintiff's opposition of Evans' directive to expire bathroom break accommodations was a but-for cause of her suspension and, ultimately, her termination. That a certain amount of enmity existed between Plaintiff and Evans prior to the January 18 meeting is obvious. However, Evans attempted to have Plaintiff *terminated* only after January 18. Prior to the accommodation meeting, Evans' campaign to raise generalized complaints of business support, HR management style, and communication issues was aimed only at justifying the need to subordinate HR (Plaintiff) to the business side (Evans). For example, while there is evidence that Plaintiff's 2015 performance review was worse than expected and was likely influenced by Evans' animosity toward her, it nonetheless assigned Plaintiff an overall rating of "Achieved Expected Performance" and included a number of optimistic statements about Plaintiff's ability to improve going forward. *See* Def.'s Ex. 1.

It was only after the January 18 meeting that Evans began circulating the draft CAR proposing formal disciplinary action against Plaintiff. Though the evidence of causality is largely circumstantial, it is significant. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (circumstantial and direct evidence are to be treated "alike"). Evans' desire to assert her control over Plaintiff after Stockton's departure stands out clearly in the record, and Plaintiff's strong disagreement with her directive to expire the bathroom break accommodations—which resulted in a serious confrontation during the January 18

meeting—was an obvious challenge to that control. Termination, as opposed to informal complaints, was not discussed until after the January 18 meeting. *C.f. Fry v. Rand Constr. Corp.*, 964 F.3d 239, 242, 248 (4th Cir. 2020) (no evidence of retaliation where the employer repeatedly communicated plans to terminate plaintiff before plaintiff took FMLA leave or revealed her medical condition).

In addition, temporal proximity between the protected activity and the adverse employment action can be highly suggestive of causation. *See*, *e.g.*, *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("[T]his Court has held that a causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity."); *Moss v. City of Abbeville*, C/A No. 8:09-cv-01859-RBH, 740 F. Supp. 2d 738, 745 (D.S.C. 2010) ("The Fourth Circuit has held two, three, and five month periods of time sufficiently close in temporal proximity to establish a causal connection for purposes of a plaintiff's prima facie case."). *But see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be 'very close.'"); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (holding that a gap in time of two and a half months was "sufficiently long so as to weaken significantly the inference of causation between the two events," although the length of time did not "undercut the inference of causation enough to render King's prima facie claim unsuccessful"). Evans sent the completed draft CAR to Alda on February 26, 2016, less than six weeks after the January 18 meeting. Presumably, Evans began compiling the draft CAR some time prior to that date. While

this temporal proximity would, at this stage of the proceedings, be insufficient to establish causation on its own, it is persuasive when combined with the other circumstantial evidence of causation in this case.

In short, although there was obviously some prior animosity between Plaintiff and Evans—which almost certainly contributed to Evans' ultimate desire to have Plaintiff terminated—the Court finds that Plaintiff's protected oppositional activity was nonetheless a but-for cause of her suspension and termination. If Plaintiff had not challenged Evans' directive to expire all employee bathroom break accommodations at the January 18 meeting, Evans would not have begun drafting the CAR and pushing to have Plaintiff terminated. Therefore, Evans' preexisting dislike does not insulate Charter from liability on Plaintiff's ADA retaliation claim. Plaintiff has sufficiently proven the element of causation.

The Court finds, by a preponderance of the evidence, that Defendant retaliated against Plaintiff for her protected activity in violation of 42 U.S.C. § 12203(a).

**Count II: Family Medical Leave Act**

"The FMLA provides covered employees with certain rights and protections, including '12 workweeks of leave during any 12-month period' for family-related reasons or for an employee's serious health condition that renders her unable to do her job." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 242, 244 (4th Cir. 2020) (quoting 29 U.S.C. § 2612(a)(1)). It is unlawful for an employer: (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA; or (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(1)–(2).

To make a successful claim for FMLA retaliation, the plaintiff must demonstrate that: "(1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events." *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019) (quoting *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015)). Defendant does not dispute that Plaintiff engaged in a protected activity by taking FMLA leave or that Defendant took an adverse employment action against her. In addition, as discussed in the previous section, the Court finds that Defendant's proffered reason for Plaintiff's suspension and termination is pretextual. The issue, therefore, is whether Plaintiff can prove a causal link between her FMLA leave and Defendant's adverse employment actions.

Within the Fourth Circuit, it is a matter of some uncertainty whether claims of retaliation for taking FMLA leave are cognizable under § 2615(a)(1) or under § 2615(a)(2). Although the Fourth Circuit previously held that such claims are properly brought pursuant to § 2615(a)(2) (titled "Discrimination"), the Department of Labor has since issued a regulation suggesting that they arise under § 2615(a)(1). *See Fry*, 964 F.3d at 245 (citing 73 Fed. Reg. 67986 (Nov. 17, 2008)). Arguably, this regulation overrules prior Fourth Circuit precedent to the contrary. *Id*. ("[T]his more recent regulation *might* require us . . . to find that retaliation-for-exercise claims fall under subsection (a)(1).") (emphasis in original). The distinction is important because, potentially, it may alter the causation requirement from the but-for standard to the mixed-motive "negative-factor" standard. *See id*. at 245–46 (declining to resolve the issue because the plaintiff proceeded under the *McDonnell Douglas* framework, which requires but-for causation regardless of the FMLA subsection).

Plaintiff does not proceed under the *McDonnell Douglas* framework in this case. Nevertheless, this Court need not attempt to resolve the issue because Plaintiff cannot satisfy either standard of causation. The only evidence presented in support of a causal link between Plaintiff's FMLA leave and Defendant's adverse employment action is Evans' history of making disparaging remarks about employees who take FMLA leave and of attempting to "crack down" on employees taking leave. More particularly, Plaintiff testified that Evans had a bias against employees with mental illness. However, Plaintiff asked her physician to omit any mention of mental illness from her FMLA certification and nothing suggests Evans was aware of the medical reason for Plaintiff's leave in January 2016. It is undisputed Evans herself took FMLA leave in 2015, and Recker, Plaintiff's replacement, took leave without any apparent retaliation by Evans.

Although the disciplinary action initiated by Evans was fairly close in time to Plaintiff's period of leave, the Court does not find that this temporal proximity alone establishes a causal link. As discussed above, Evans' circulation of the draft CAR followed the contentious January 18 meeting in which Plaintiff directly challenged Evans' authority over the bathroom break accommodations and then communicated her concerns to Farber. The evidence does not support a conclusion that Plaintiff's decision to take FMLA leave played any part in Evans' decision to pursue disciplinary action, which ultimately led to Plaintiff's suspension and termination. The Court therefore finds no retaliation in violation of 29 U.S.C. § 2615(a).

**Damages**

Having found Defendant liable on Plaintiff's claim under the ADA, the Court turns to the question of what damages should be awarded. Plaintiff seeks the following: back

pay including employee benefits; front pay; and reasonable attorney's fees, costs, and interest.[10]  Damages are governed by statute.  *See* 42 U.S.C. § 2000e-5g[11] (remedies for ADA retaliation).

A. <u>Mitigation</u>

Plaintiffs asserting claims of employment discrimination have a duty to mitigate damages "by diligently seeking and accepting new employment substantially equivalent to that from which [they were] discharged."  *Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001) (quoting *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985)) (internal quotation marks omitted).  The duty to mitigate extends to the plaintiff's new position.  "[W]here the discharged . . . plaintiff subsequently finds similar employment, but then voluntarily quits, back pay should be decreased by the amount he would have earned had he not quit."  *Brady*, 753 F.3d at 1273.  Therefore, "an employee who has unjustifiably quit is entitled to the difference between his prior earnings and the earnings he would have obtained had he not quit suitable alternative employment."  *NLRB v. Pepsi Cola Bottling Co. of Fayetteville, Inc.*, 258 F.3d 305, 311 (4th Cir. 2001).

The Court finds that Plaintiff voluntarily resigned from her position at Benore, and is therefore entitled only to the amount of back pay she would have received if she had remained there.  Though Plaintiff maintains her resignation was a direct result of her depression, which was exacerbated by working under Evans and being fired from

---

[10] Because the Court does not find in Plaintiff's favor on her FMLA claim, the FMLA's liquidated damages provision is inapplicable.

[11] 42 U.S.C. § 12203, pursuant to which Plaintiff brings her ADA retaliation claim, refers to 42 U.S.C. § 12117 for the remedies applicable in the employment context.  *See* 42 U.S.C. § 12203(c).  Section 12117, in turn, refers to 42 U.S.C. § 2000e-5g for the remedies available in civil actions brought by individuals.

Charter, this is not reflected in the record. Plaintiff's contemporaneous exit interview demonstrates that she was dissatisfied with her position for other reasons, including its physical demands and lack of efficient structure. *See* Def.'s Ex. 65. Moreover, even if the Court were to accept Plaintiff's assertion that she resigned due to depression, it is undisputed that her depression was preexisting and had caused her to miss work intermittently since 1994. Plaintiff provided no expert testimony or other convincing evidence that the retaliation by Defendant directly caused an exacerbation in her depression and/or her resignation from Benore. Her damages of back pay (and front pay, if applicable) will therefore be limited to what she could have recovered if she had remained in her position at Benore.

B. Back Pay

The ADA specifically contemplates the award of back pay as a remedy for retaliation. 42 U.S.C. § 2000e-5g. As described above, however, employees are responsible for mitigating their damages, and their earnings "shall operate to reduce the back pay otherwise allowable." *Id*.

The Court finds that Plaintiff is entitled to an award of back pay, but that her award should be reduced in accordance with her failure to mitigate by voluntarily resigning from Benore. In *Brady*, the Fourth Circuit calculated as follows:

> Brady is entitled to back pay from the time of his discharge[12] by Thurston until the day of his discharge by Thompson-Burke; during this period, Thurston should receive a credit for the wages Brady actually earned. During the period of unemployment following the Thompson-Burke discharge, Brady is entitled to no back pay. The back pay period commences to run again upon Brady's reemployment by AEP Industries;

---

[12] The court had previously held that a discharge for misconduct was functionally equivalent to a voluntary resignation for purposes of mitigation.

for such reemployment period Thurston should receive a credit for the wages Brady would have earned had he remained at Thompson-Burke at the wage rate effective upon that discharge[.]

753 F.2d at 1279 (footnote added).

Following this instruction, the Court finds that Plaintiff's back pay award is properly calculated as follows:

(a) From April 1, 2016, through May 22, 2016, Plaintiff is entitled to the full amount of her ending Charter salary.

(b) From May 23, 2016, through August 15, 2016, during her employment at Benore, Plaintiff is entitled to the difference between her ending Charter salary and her Benore salary.

(c) From August 16, 2016, through April 30, 2017, Plaintiff's period of unemployment following her voluntary resignation from Benore, Plaintiff is entitled to no back pay.

(d) From May 1, 2017, through the date of judgment, Plaintiff is entitled to the difference between her ending Charter salary and her Benore salary.

As to the annual bonus and 3% pay raise contingent on Plaintiff's meeting performance expectations, the Court finds that their award would be unduly speculative because Plaintiff has not adequately demonstrated that she would have met performance expectations from 2016 onward. *See*, *e.g.*, *Neufeld v. Searle Laby's*, 884 F.2d 335, 342 (8th Cir. 1989) (denial of bonus and fringe benefits was proper where their amount was "merely speculative"). On Plaintiff's 2015 performance review, which Evans completed prior to the January 18 meeting, Plaintiff received the lowest possible rating for which it was still possible to receive her annual bonus. Moreover, despite the Court's finding that Plaintiff's performance problems were a merely pretextual reason for her suspension and

termination, Defendant has adduced significant evidence of some legitimate performance problems that might well have precluded a bonus and pay raise beginning in 2016. Therefore, the annual bonus and 3% pay raise are not included in Plaintiff's back pay award, and Plaintiff is entitled to a total base salary back pay award of **$55,523.17**.[13]

In addition, the parties have stipulated that Plaintiff would have received LTIP awards vesting each year from 2017 through 2023. Nothing in the record suggests that these awards were contingent on meeting specific performance expectations. However, only those amounts that would have vested during the back pay period are properly included in the back pay award.[14] The stipulated total amount of LTIP awards that would have vested before the date of judgment is **$150,765.00**.[15]

Finally, prejudgment interest "is an element of complete compensation" in the back pay award authorized by 42 U.S.C. § 2000e-5(g). *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (internal quotation marks and citation omitted). Accordingly, the Court will grant Plaintiff prejudgment interest calculated at the appropriate rate.

C. Front Pay

"Front pay is money awarded for the loss of employment after the date of judgment." *Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 388 (4th Cir. 2008)

---

[13] This includes 52 days at a per diem salary of $273.97 (Plaintiff's ending Charter salary), 84 days at a per diem rate of $27.39 (the difference between Plaintiff's Charter salary and her Benore salary), 257 days of no back pay, and 1,423 days at a per diem rate of $27.39.

[14] Benefits vesting after the date of judgment would instead constitute front pay, discussed below.

[15] This includes, as stipulated, $30,765.00 for 2014, $30,000.00 for 2015, $30,000.00 for 2016, $30,000.00 for 2017, and $30,000.00 for 2018, vesting in mid-January of 2017, 2018, 2019, 2020, and 2021, respectively.

(citation omitted). The decision to award front pay to an ADA plaintiff "is a matter left to the discretion of the trial judge." *Id*. (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)). However, the use of front pay as a remedy must be "tempered" because of the "potential for windfall." *Duke*, 928 F.2d at 1424. "There is no precise formula for determining whether or in what sum an award of front pay should be made." *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 238 (4th Cir. 2007) (citing *Duke*, 928 F.2d at 1423). Accordingly, the trial court may consider various factors—including, but not limited to, a plaintiff's efforts at mitigation—in making its determination. *See id*. (citing *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995)).

The Court finds that an award of front pay would be unwarranted in the present case. In so finding, the Court takes into particular account Plaintiff's failure to mitigate, as described above, and the unduly speculative nature of awarding front pay to begin nearly five years after Plaintiff's termination by Charter. *See Deltek, Inc. v. Dep't of Labor*, 649 F. App'x 320, 334 (4th Cir. 2016) ("By their nature, front pay awards are speculative, but they cannot be unduly so[.]" (internal quotation marks and citation omitted)). The potential for undue speculation is of particular concern given Plaintiff's checkered employment history following her unlawful termination. The Court simply cannot determine with the requisite level of certainty that Plaintiff would have remained in her position at Charter past the date of trial. Nor, given the extended timeframe, can the Court reasonably "assume that [Plaintiff] would never earn a salary comparable" to what she made at Charter. *See Dotson v. Pfizer*, 558 F.3d 284, 300 (4th Cir. 2009).

In addition, the Court notes that Plaintiff is currently making a base annual salary of $82,500 in her position at ChartSpan. In *Dotson*, the Fourth Circuit held that the district court did not err in finding an award of front pay unduly speculative where,

> [a]t the time the court ruled on Dotson's request for front pay, Dotson had secured full-time employment in the pharmaceutical services industry, making approximately $65,000 less than the approximately $232,000 in salary and benefits he made prior to his termination. Thus, he had secured comparable, if not precisely equivalent, work at another major drug company.

*Id*. Likewise, although Plaintiff's present salary does not equal her base salary of $99,999 at the time she left Charter, it represents reasonably comparable employment and weighs against an award of front pay. Accordingly, Plaintiff's request for front pay will be denied.

D. <u>Fees and Costs</u>

The ADA permits the Court, in its discretion, to award a reasonable attorney's fee and costs to the prevailing party. 42 U.S.C. § 12205. "The reasonableness of a fee award relates primarily to the plaintiff's degree of success." *Small v. Dellis*, 211 F.3d 1265 (Table), 2000 WL 472873, at *2 (4th Cir. 2000) (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). Pursuant to Local Civil Rules 54.02(A) and 54.03, Plaintiff may submit a request for attorney's fees and costs, as well as supplemental argument regarding the appropriateness of such award, no later than **April 7, 2021**. Defendant may respond no later than **April 21, 2021**.

III.         **CONCLUSION**

Based on the foregoing Findings of Fact and Conclusions of Law, the Court hereby:

1. **DENIES** Defendant's oral motion pursuant to Fed R. Civ. P. 52(c);

2. **FINDS** Defendant liable as to Plaintiff's claim of retaliation in violation of the Americans with Disabilities Act;

3. **FINDS** Defendant NOT liable as to Plaintiff's claim of retaliation in violation of the Family and Medical Leave Act;

4. **DIRECTS** the parties to submit supplemental briefing on the subject of attorney's fees and costs as set forth above; and

5. **DIRECTS** the Clerk to enter judgment in favor of Plaintiff Tonia Buie, against Defendant Charter Communications, in the amount of **$206,288.17** in back pay plus applicable pre-judgment interest.

s/ Donald C. Coggins, Jr.
United States District Judge

March 24, 2021
Spartanburg, South Carolina